In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1889

SABRI I. SAMIRAH,

*Plaintiff-Appellee*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1298—**James B. Moran**, *Judge*.

ARGUED SEPTEMBER 8, 2010—DECIDED DECEMBER 3, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*.    In the more than seven years
that have elapsed since our first decision in this
seemingly interminable immigration case, *Samirah v.
O'Connell*, 335 F.3d 545 (7th Cir. 2003), the issues pre-
sented to us have changed, requiring us to conduct a
fresh analysis. The government insists that our first
decision, reversing the grant of a preliminary injunction

to the plaintiff, is dispositive of the present appeal. That isn't true. The issues are different. The central issue in the first appeal—the reviewability of revocation of "advance parole"—has dropped out, and the relief sought in the present appeal (mandamus) is different from that sought unsuccessfully in the prior one (habeas corpus). We'll see that an immigration regulation entitled the plaintiff, upon the revocation of his advance parole, to the restoration of his pre-parole status, that of an applicant to adjust his status from nonlawful resident to lawful resident. But to pursue his application, he had, by law, to be physically present in the United States. The government, in violation of the regulation, refused to let him return to the United States. He is entitled to a writ of mandamus directing the Attorney General to enable him to return. That is the case in a nutshell, but the complexity of immigration law will require an unavoidably tedious elaboration of our analysis. The issues presented by this appeal have not been briefed and argued as carefully as we would like, perhaps because of that complexity; but we think we can see our way clear to a sound result.

The plaintiff, a citizen of Jordan, first came to the United States 23 years ago on a student visa. Although the visa expired at some point, he remained in the United States. He didn't become a lawful resident, but he obtained a Ph.D., married, had three children, was continuously employed, and had never been placed in deportation (now called removal) proceedings. Twice he applied to adjust his status to that of a lawful resident and both times he was turned down, the first time

because he had accepted employment without the immigration service's authorization and the second time because a religious-worker visa obtained on his behalf by the American Middle Eastern League was determined to be invalid. In the course of the second rejection the immigration service cited two media reports which suggested that the plaintiff was affiliated with political groups that either supported Hamas or endorsed its views. The government has not repeated these shadowy accusations in the present proceeding, and the plaintiff has never been placed in removal proceedings.

In 2002, the year after the denial of his second application for adjustment of status, the plaintiff learned that his mother, who lives in Jordan, was ill. He hadn't seen her for years and wanted to visit her. But he also wanted to preserve the opportunity to adjust his status, so he filed a third application and at the same time asked the immigration authorities for what is called "advance parole." Advance parole authorizes an applicant for adjustment of status to travel outside the United States without prejudice to his application, and to return—even though he isn't a lawful resident and doesn't have a visa—to prosecute it. 8 C.F.R. § 212.5(f); *Brito v. Mukasey*, 521 F.3d 160, 162 n. 1 (2d Cir. 2008). The regulation that authorizes parole (and does not distinguish between advance parole, which lets an alien leave the country without jeopardizing his immigration status, and parole granted to an alien outside the country to allow him to enter without his thereby obtaining the status of a lawfully admitted alien) also provides that "upon accomplishment of the purpose for which parole was auth-

orized or when in the opinion of one of [designated] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5(e)(2)(i). The meaning of "restored to the status that he or she had at the time of parole" is the central issue presented by the appeal.

In December 2002 the immigration service granted the plaintiff advance parole (it didn't have to, but it did), and having done so sent him a travel document (Form I-512L) authorizing "a transportation line to accept the named bearer on board for travel to the United States without liability . . . for bringing an alien who does not have a visa." The form, which thus is a substitute for a visa, goes on to explain that its purpose is to enable the bearer to return to the United States "to await the adjudication of his application for adjustment of status." An application for adjustment of status cannot be filed by someone who is not in the United States, 8 U.S.C. § 1255(i); 8 C.F.R. § 245.1(a), and the application is deemed abandoned if the applicant leaves the country without having been granted advance parole. 8 C.F.R. §§ 245.2(a)(4)(ii)(A)-(B).

Nevertheless, when, his visit completed, the plaintiff tried to return to the United States, the immigration service informed him that his advance parole had been revoked, and it refused to let him enter the country despite the fact that he was carrying his unex-

pired Form I-512L. Although the form does say that the bearer may be denied reentry to the United States if he is "inadmissible," 8 U.S.C. § 1182, the plaintiff has never been determined to be inadmissible.

The government argues that the revocation of his advance parole made him inadmissible because it left him without an entry document, as required by 8 U.S.C. § 1182(a)(7)(A)(i)(I) for admission to the United States. The government is wrong. Form I-512L is a travel document, a substitute for a visa (it *says* so), the purpose of which is to tell immigration officers that the bearer is entitled to enter the United States. The government argues that the alien needs a fresh grant of parole, after his advance parole terminates, to be readmitted. To require the alien to obtain a fresh grant of parole would contradict both the regulation and the form—the form because it is the equivalent of a visa, and the regulation because it requires that the bearer's status as of when advance parole was granted be restored when the parole ends. That status includes being present in the United States. One of the statutory qualifications for an adjustment of status that is applicable to the class of aliens to which the plaintiff belongs is, as we said, that the alien be in the United States. The status the plaintiff enjoyed before he received advance parole, and hence the status he reacquired by virtue of the regulation upon the termination of his advance parole, was that of an alien eligible for an adjustment of status and therefore, among other things, physically present in the United States. Restoration of his status thus requires his return to this country. So if the revocation of advance

parole canceled the plaintiff's Form I-512L travel document, the government was required—subject to exceptions discussed later in this opinion—to issue him another one, or admit him without documentation, in order to honor the promise in the parole regulation to restore an alien whose parole is canceled to his prior status.

It is true that *Palmer v. INS*, 4 F.3d 482, 484 (7th Cir. 1993), says that "an alien seeking to adjust his status to that of a lawful permanent resident is assimilated to the position of an applicant for entry into the United States." But that was said in a case in which the alien was in the United States and so could pursue his application for adjustment of status. When the applicant is outside the United States, the restoration of his status as an applicant for adjustment of entry requires that he be allowed to return to this country. Of course, so far as entitlement to such an adjustment is concerned, the applicant has no greater rights than that of an applicant who is already in the United States.

Had the plaintiff, instead of trying to fly back to the United States, flown to Canada or Mexico and then smuggled himself into this country without being detected and apprehended, he would have been subject to removal like any other nonlawful resident. But that would not have prevented him from pressing his application for adjustment of status. The status sought is that of lawful resident; the seeker by definition is not a lawful resident. Not being a lawful resident of the United States, the plaintiff was subject to removal before he left the country on advance parole. Yet no such proceeding had

ever been brought against him, or, so far as we know, had ever been contemplated. By whatever means or route he got back to the United States, even if it was in a coffin in the cargo hold of an airliner, disguised as Count Dracula (cf. *Love at First Bite*), he could have continued to seek to adjust his status to that of a lawful resident, until and unless he was removed.

And likewise if the plaintiff had flown directly to the United States from Jordan. But his flight happened to make a stop at Ireland's Shannon Airport. Congress has authorized the establishment of U.S. immigration checkpoints at foreign airports in order to prevent unauthorized persons from flying into the United States, 8 U.S.C. § 1225a; 8 C.F.R. § 235.5; A. James Vazquez-Azpiri & Daniel C. Horne, "The Doorkeeper of Homeland Security: Proposals for the Visa Waiver Program," 16 *Stan. L. & Policy Rev.* 513, 545-47 (2005), and one of these checkpoints is at Shannon. (There was no checkpoint at Jordan's international airport when the plaintiff flew to Shannon.) Upon entering the Shannon checkpoint the plaintiff was handed a letter from a U.S. immigration official in Chicago informing him that his advance parole had been revoked because he was a "security risk" and he would not be permitted to enter the United States. He flew back to Jordan and has not returned to the United States since; we assume that either before or after being turned away at Shannon he was placed on the U.S. "no fly" list and is thus unable to fly to the United States from any airport. The government has made clear its unwillingness to issue him a visa or other entry document, contends that he has no legal remedy against permanent

exclusion from the United States, and deems his application for adjustment of status abandoned because he is outside the country.

Revocation of parole, because it is an exercise of discretionary authority by the immigration authorities, 8 U.S.C. § 1182(d)(5)(A), is not judicially reviewable, as we held in our first decision. *Samirah v. O'Connell*, *supra*, 335 F.3d at 548-49; see 8 U.S.C. § 1252(a)(2)(B)(ii); *Kucana v. Holder*, 130 S. Ct. 827, 836-37 (2010). What we have now to decide is the consequence of revocation. That was not an issue in the previous appeal. The plaintiff had raised it in the district court, but it was not discussed or resolved in our opinion, and so in the further proceedings that followed our reversal of the grant of a preliminary injunction the district court assumed not unreasonably that the issue remained for resolution.

Recall that the parole regulation (8 C.F.R. § 212.5(c)) states that upon revocation of parole the alien is restored to his status before he was paroled. It's true that it also says that parole shall be revoked "upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of [designated] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." But to read this to mean that when parole is revoked the alien is excluded would make the regulation incoherent, because the alien's pre-existing status as an applicant for an adjustment of status, which termination of parole restores, includes presence in the United States. The meaning rather is that someone whose parole is revoked

has no right to *remain* in the United States, as he is not a lawful resident and is subject therefore to removal, but that if he had applied for an adjustment of status when he was here he can *return* to the United States so that he can pursue his application. What happens to him after he returns—whether for example he is placed in removal proceedings, and perhaps removed before his application for adjustment of status is acted on—is not determined by his having been restored to his status as a seeker of an adjustment of status. This interpretation is confirmed by Form I-512L, which tells immigration officers to readmit the bearer of the form even though he has no visa.

The government's lawyer told us at argument that being present in the United States and seeking an adjustment of status do not constitute a "status" within the meaning of the regulation. We don't agree, as we explained earlier in distinguishing this case from *Palmer*. The statute governing adjustment of status sets forth in detail who may seek to adjust his status to that of an alien lawfully admitted for permanent residence. It defines, in other words, the status seeker's status.

Circumstances might, despite the regulation, justify the government in refusing to allow the return of someone whose advance parole had been revoked; for remember that Form I-512L warns the bearer that he won't be readmitted if he's "inadmissible." See, e.g., *In re G-A-C-*, 22 I. & N. Dec. 83, 88-89 (BIA 1998) (en banc). The only ground of inadmissibility mentioned in the Form I-512 that was given to the plaintiff—8 U.S.C.

§ 1182(a)(9)(B)(i)—appears (as implied by the section's caption) to affect only aliens who have previously been removed from the United States, and the plaintiff hadn't been; in any event the government has not argued that he was inadmissible under that section.

The statute governing admissibility also authorizes the exclusion of aliens who are believed to endanger national security, 8 U.S.C. § 1182(a)(3), and we shall assume that this provision applies to returning parolees even though it's not mentioned in Form I-512L. Yet even though the letter from the immigration official in Chicago said that the plaintiff was being barred from returning to the United States because he was a "security risk," the government does not invoke section 1182(a)(3) in its appeal and we can't determine from the record whether the plaintiff *is* a security risk in a relevant sense. The government will not disclose the basis of its supposal that he is one or even the criteria that the immigration official who declared the plaintiff a security risk used in making that determination. And as far as we know there was no internal review in the Justice Department or the Department of Homeland Security of the determination; it was made by DHS and we don't even know whether the Justice Department, while representing DHS in this litigation, agrees with it.

Moreover, except in the case of an "arriving alien"—and for purposes of removal an alien granted advance parole is not deemed to be one upon his return to the United States, see 8 C.F.R. § 1.1(q)—inadmissibility must be determined by an immigration judge, rather than by an

immigration officer at a checkpoint or port of entry. 8 U.S.C. § 1229a(a). Of course the plaintiff has not returned to the United States, but the point is only that, should he return, he could not be denied admission without a determination by an immigration judge that he was inadmissible. This point is important for two reasons: an immigration judge is a judicial officer; and the fact that no immigration judge was involved in the decision to exclude plaintiff from the United States shows that the ground for excluding him was not that he was inadmissible.

Although the plaintiff—a highly educated, steadily employed, long-time resident in the United States, whose children are U.S. citizens—would ordinarily be considered a good candidate to be allowed to adjust his status to that of a lawful permanent resident, *Elkins v. Moreno*, 435 U.S. 647, 667-68 (1978); *Patel v. INS*, 738 F.2d 239, 242-43 (7th Cir. 1984); *In re Hashmi*, 24 I. & N. Dec. 785, 793 (BIA 2009); *U.S.C.I.S. Adjudicator's Field Manual*, § 23.2(d) (updated through Oct. 6, 2010), the denial of his two previous applications, and the possible (though only, as far as we know, a rumored) link to Hamas, suggests not. But if not—if indeed he's a threat to the security of the United States—he can be subjected to removal or perhaps even to criminal proceedings upon his return to this country and can be detained until those proceedings are completed. Advance parole entitled him to return to the United States for the sole purpose of pressing his application for adjustment of status; it gave him no greater rights than if he'd never left. *Barney v. Rogers*, 83 F.3d 318, 321 (9th Cir. 1996); see also *Assa'ad*

*v. U.S. Attorney General*, 332 F.3d 1321, 1326-27 (11th Cir. 2003). Maybe he can be declared inadmissible; but that hasn't been done, as we said. By refusing to grant him a visa, the government is arbitrarily preventing him from exercising the right granted to him by the advance-parole regulation.

Don't be fooled by the word "parole." In normal usage it means you're tentatively free but if you violate the conditions of your freedom you'll be sent back to prison. When "advance parole" in the immigration setting is revoked, your status is restored and you're just sent back to the United States, which we prefer to think of as the land of liberty rather than as a prison. Advance parole is the right to leave the United States without (in a case such as this) abandoning your right to seek adjustment of status upon your return. Revocation of advance parole terminates your "liberty" to be footloose abroad and requires you to rush back here to preserve your application.

The government makes the startling argument that "advance parole" is not "parole." If it is not parole, what is it? If Form I-512L is not a travel document entitling an alien granted advance parole to return to the United States (unless he is "inadmissible," which the plaintiff was not), what is it? The parole regulation describes advance parole as "parole," 8 C.F.R. § 212.5(f), and the only statutory authority for granting advance parole is found in the statutory provision that authorizes the grant of parole. 8 U.S.C. § 1182(d)(5)(A). If advance parole isn't parole, the parole regulation doesn't mean

what it says and the Attorney General has no authority to grant advance parole. Advance parole was held in *Succar v. Ashcroft*, 394 F.3d 8, 15 n. 7 (1st Cir. 2005), to be one of several types of immigration parole.

The government's argument is based rather desperately on a footnote in a request for comment on a proposed rule. Eligibility of Arriving Aliens in Removal Proceedings, 71 Fed. Reg. 27,585-01, 27,586 n. 1 (May 12, 2006). The footnote states that "'advance parole' is the determination of an appropriate DHS officer that DHS should agree to the exercise of the parole authority under Section 212(d)(5)(A) of the Act before the alien's actual arrival at a port-of-entry. The actual decision to parole, however, is made at the port-of-entry. Since any grant of parole may be revoked, 8 C.F.R. § 212.5(e), a decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry." A request for comments is not a regulation; the request to which the footnote was appended was only peripherally concerned with parole (the aim of the proposed rule was to resolve a circuit split over whether an immigrant placed in removal proceedings could apply for adjustment of status); and the footnote is inconsistent with the parole regulation, which states that "when parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued Form I-512," 8 C.F.R. § 212.5(f)—the advance-parole travel document.

To support its contention that advance parole is not parole but some other animal in the immigration

bestiary, the government cites *Barney v. Rogers*, *supra*, and *In re G-A-C-*, *supra*. If the government were correct, these cases would be inconsistent with the First Circuit's decision in *Succar*, which is explicit that advance parole is a form of parole. But the government is misreading them. *Barney v. Rogers* says that advance parole gives an alien a "right to return for the purpose of completing her Adjustment Application"—precisely what the plaintiff is seeking. 83 F.3d at 321. And in like vein the Board of Immigration Appeals, in *In re G-A-C-*, *supra*, described advance parole as "a mechanism by which a district director can, as a humanitarian measure, advise an alien who is in this country, but who knows or fears that he will be inadmissible if he leaves and tries to return, that he can leave *with assurance that he will be paroled back into the United States upon return*, under prescribed conditions, if he cannot establish that he is admissible at that time" (emphasis added). 22 I. & N. Dec. at 88. The Board went on to say that "the term 'advance parole' is something of a misnomer"—that really it means "advance authorization of parole": "the alien is advised in advance of a departure that, if he meets certain conditions, he will be paroled into the United States when he returns." *Id.* at 88 n. 3. The plaintiff in this case met those conditions, which are set forth in Form I-512L. Another case, *Ibragimov v. Gonzales*, 476 F.3d 125, 132 (2d Cir. 2007), similarly describes advance parole as "a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry"—again the right that the plaintiff in this case is claiming.

So whether "advance parole" is "parole" turns out to be a quibble. If it is not a form of "parole," it is a promise of parole—that is, a promise of permission to reenter the United States so that the parolee can press his application for adjustment of status.

Moreover, it is important in interpreting judicial opinions, as in interpreting other documents, to read words in context. Each of the cases on which the government relies involved an alien who had been granted advance parole, had left the country, and had been readmitted pursuant to a new grant of parole. Later the alien's status became an issue and was held to be his status when paroled *into* the country, not when allowed to leave under a grant of advance parole. All that the cases stand for, in short, is that when an alien who had been granted advance parole is paroled back into the country, that second grant supersedes the grant of advance parole so far as determining the alien's status "at the time he was paroled" is concerned.

Neither case addresses the consequence of a revocation of advance parole while the alien is out of the country. They thus do not bear on the right of an alien like the plaintiff to be restored to his status at the time of the only parole that he had ever been granted—advance parole.

Curiously, the parole statute says that after revocation of advance parole "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

Being an applicant for admission to the United States is a different status from being an applicant for adjustment of status, the status the plaintiff enjoyed when he left the United States on parole. And he was never in custody. Probably all that the quoted language means is that an alien derives no superior status, by virtue of having obtained advance parole, when parole is revoked. That certainly is true, but the plaintiff is not seeking a better status than he had before it was granted.

So: the "restoration of status" regulation is unambiguous; our interpretation of it as entitling the parolee, upon revocation of his advance parole, to return to the United States to press his application for adjustment of status is confirmed by Form I-512L; the government does not suggest that the regulation (its own regulation) is invalid; and the government has violated the regulation to the plaintiff's detriment. What next?

Nothing next, says the government; for, whatever the apparent merits of this appeal, our decision turning down the previous appeal terminated the entire litigation once and for all in sweeping language: "Section 1252(a)(2)(B)(ii) bars jurisdiction over the rest of Samirah's action." 335 F.3d at 552. But section 1252(a)(2)(B)(ii) is just the section that makes the grant, denial, and—of especial significance in this case—revocation of parole nonreviewable. That is a given in this case. The question is what happens after revocation—has the plaintiff a right to return to the United States to press his application for adjustment of status? Section 1252(a)(2)(B)(ii) does not answer that question and it was not a question addressed in our previous decision.

And what is "the rest of Samirah's action" that we said in our first opinion was barred? The only "action" before us in the first appeal was the plaintiff's quest for an injunction against the revocation of his advance parole, a quest that he based on a claim to be entitled to habeas corpus relief. We held that he had no right to obtain habeas corpus relief. 335 F.3d at 549-52. That ruling was right then and is right now. *Wales v. Whitney*, 114 U.S. 564, 571 (1885); *Terrado v. Moyer,* 820 F.2d 920, 921-22 (7th Cir. 1987) (per curiam); *Patel v. U.S. Attorney General*, 334 F.3d 1259, 1263 (11th Cir. 2003). Habeas corpus is a remedy for people in custody; exclusion from the United States is not custody. We didn't address the remedies that the plaintiff might have, after his challenge to the revocation of his advance parole failed, for a violation of the regulation specifying the consequences of revocation. We could not have meant to extinguish a possible remedy by way of mandamus, because to do so would have overruled (without circulation of the opinion to the full court in advance of publication, as required by 7th Cir. R. 40(e)) our decision in *Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002), which had held that section 1252(a)(2)(B)(ii) does *not* bar an alien from seeking mandamus.

Nor is it true that our previous decision, by reversing the district court without stating that the case was being remanded, ended the litigation, foreclosing the further proceedings in the district court that led to the grant of relief that the government is now contesting. The prior appeal, because it was from the grant of a preliminary injunction, was interlocutory. It invoked our appel-

late jurisdiction under 28 U.S.C. § 1292(a), not § 1291 (final orders). There was no occasion for a remand; the case remained pending in the district court during and after the appeal. We have reversed the grant of preliminary injunctions in the past without using the word "remand," and the district court has proceeded to the merits after the reversal. See, e.g., *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 664 (7th Cir. 1995); on remand, 1995 WL 904908 (N.D. Ill. 1995).

And what if we did word our decision so loosely as to enable an interpretation that has us having resolved issues not before us and extinguished rights (specifically the right to return to the United States *after* revocation of advance parole) and remedies (specifically, mandamus) that were not yet ripe for decision because the litigation had not yet proceeded far enough? Is the plaintiff to be punished because we were imprecise?

The plaintiff, his action to restore his advance parole having failed, wants only to be allowed to return to the United States to pursue his application for adjustment of status. That is a right that the regulation unambiguously confers on him, and the unequivocal violation of a statute or regulation imposing a duty on a federal official can be rectified by mandamus—an order "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361; see *Iddir v. INS*, *supra*, 301 F.3d at 499-500; *Rios v. Ziglar*, 398 F.3d 1201, 1206-07 (10th Cir. 2005); cf. *Davis Associates, Inc. v. Secretary of Housing & Urban Development*, 498 F.2d 385, 389 n. 5 (1st Cir. 1974);

*United States ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371, 374 (2d Cir. 1968).

Neither in its briefs nor at oral argument has the government been able to give any reason—some ground for bending the language of its own regulation to avoid absurd or otherwise untoward consequences—why the plaintiff should not be allowed to return to the United States to pursue his application for adjustment of status. He did nothing wrong by going to visit his sick mother in Jordan—the government said he could do so and return. If he is a threat to U.S. security, he can be returned under guard and kept under guard until the application is disposed of or removal or criminal proceedings brought to successful completion against him. The government has not suggested that he is too dangerous to be allowed on an airplane—in fact it has not suggested that he is dangerous at all. One can be a "security risk" without creating a risk of committing a violent act.

No one has told us *what* kind of "security risk" the plaintiff is. The government points to no facts or reasoning that might support the immigration service's refusal to allow him to return to the United States. No evidence is mentioned that might connect him to Hamas. There is just the cryptic statement by the government's lawyer at oral argument—a statement redolent of guilt by association—-that maybe the plaintiff "needs better friends" (what he really needed was a better travel agent, who wouldn't have routed him through Shannon). The government is going for broke: it wants

an opinion from us that will affirm its right to disregard its own regulation and exclude an alien on the basis of a groundless suspicion or, for that matter, no suspicion.

The government's insistence that a grant of advance parole creates no right of reentry to the United States (or if it does create such a right, no remedy for its violation) comes close to nullifying advance parole; for what applicant for adjustment of status (and thus not yet a lawful resident) would take a chance on leaving the country if he can be denied reentry on an immigration officer's whim? The Attorney General can abolish advance parole if he wants, but he cannot be permitted to make it a trap—a device for luring a nonlawful resident out of the United States so that he can be permanently excluded from this country without any of the procedural protections that he would enjoy if, remaining in the United States, he could be removed only in a removal proceeding.

The government argues finally that the refusal of a consular official to issue a visa to an alien cannot be reviewed by the courts; and it adds (incorrectly, as we'll see) that without a visa the plaintiff, being an alien, won't be allowed back into the United States even if he waves an order of mandamus in the face of a consular official; so the plaintiff is checkmated even if his rights have been violated. The government also points out that the plaintiff has not applied for a visa—of course not; he knows it would be denied.

The doctrine of "consular nonreviewability," on which the government's argument is based and which in

the United States at least has a tarnished pedigree, having been first recognized by the Supreme Court in cases that authorized the expulsion of hapless Chinese laborers, see *Fong Yue Ting v. United States*, 149 U.S. 698, 707, 713-14 (1893); *Chae Chan Ping v. United States (the Chinese Exclusion Case)*, 130 U.S. 581, 609 (1889); Donald S. Dobkin, "Challenging the Doctrine of Consular Nonre-viewability in Immigration Cases," 24 *Georgetown Immigration L.J.* 113, 116-22 (2010), tells courts not to second guess the immigration authorities' refusal to issue a visa to a foreigner. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543-44 (1950); *Kleindienst v. Mandel*, 408 U.S. 753, 765-67 (1972); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159-60 (D.C. Cir. 1999); *Burrafato v. U.S. Dept. of State*, 523 F.2d 554, 556 (2d Cir. 1975). But like most general legal principles it is qualified. As explained in *United States ex rel. Knauff v. Shaughnessy*, *supra*, 338 U.S. at 543, "it is not within the province of any court, *unless expressly authorized by law*, to review the determination of the political branch of the Government to exclude a given alien" (emphasis added).

So there's a presumption against judicial review of denials of visas to foreigners, but not a conclusive one. See, e.g., *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008); *Allende v. Schultz*, 845 F.2d 1111 (1st Cir. 1988); see also *Kleindienst v. Mandel*, *supra*, 408 U.S. at 770. Its normal operation is illustrated by *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), vacated, 130 S. Ct. 1235, reinstated in amended form, 605 F.3d 1046 (D.C. Cir. 2010). No law authorized the plaintiffs in that case to enter the United

States. Our plaintiff, in contrast, has a right to be "restored to the status that he had at the time of parole," 8 C.F.R. § 212.5(e), which includes, as we keep saying, physical presence in this country.

Several cases apply the exception recognized in *Knauff* to aliens entitled to mandamus because they have a clear right to be in the United States. *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010); *Patel v. Reno*, 134 F.3d 929, 931-32 (9th Cir. 1997); *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988). (We said in *Ahmed v. Dep't of Homeland Security*, 328 F.3d 383, 388 (7th Cir. 2003), that we might agree with these cases if the issue arose. See also *Iddir v. INS*, *supra*, 301 F.3d at 499-500.) The plaintiff in this case, as in the cases cited, is unlike the typical alien, who has no right to a visa. This alien has a right, conferred by a regulation the validity of which is conceded all around, to be in this country.

Visas are issued by the State Department, however, and it is not a party to this case. It could be made a party, but that is unnecessary. The plaintiff doesn't need a visa. The Attorney General is authorized by the parole statute to parole him into the United States, 8 U.S.C. § 1182(d)(5)(A), and by regulation to grant parole "to an alien who will travel to the United States without a visa." 8 C.F.R. § 212.5(f). The fact that the plaintiff's advance parole was revoked doesn't preclude a fresh grant of parole to let him back in—an action not only consistent with the statute but (since his original travel document, the Form I-512L, has expired) required to place the government in compliance with the parole regula-

tion—required unless an alternative route is opened to the plaintiff. Or an immigration officer can, either at a port of entry or at a pre-inspection station, 8 C.F.R. § 235.5, admit an alien upon determining that he is "clearly and beyond a doubt entitled to be admitted" to the United States. 8 U.S.C. § 1225(b)(2)(A); see *Clark v. Martinez*, 543 U.S. 371, 373 (2005). This subsection applies to any alien who is not an "arriving alien," and as we noted earlier an alien granted advance parole is not an arriving alien.

We do not retract our earlier statement, based on our previous decision, that the immigration statute makes the grant of advance parole discretionary, 8 U.S.C. § 1182(d)(5)(A), and its revocation likewise when it says that "when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*; see *Samirah v. O'Connell, supra*, 335 F.3d at 548-49; *Hassan v. Chertoff*, 593 F.3d 785, 789-90 (9th Cir. 2010); cf. *Webster v. Doe*, 486 U.S. 592, 600 (1988). But it isn't true that if we can order the Attorney General to grant parole, the decision whether to grant or deny or revoke parole is no longer in his discretion. He has limited his discretion by promulgating the regulation that requires that upon termination of advance parole the parolee be restored to his pre-parole status, and there is no suggestion that the Attorney General cannot limit his own discretion in this way—it would actually curtail his discretionary authority if he could not limit his discretion.

Just as a state may give its people more legally enforceable rights than a statute or a constitutional provision requires, e.g., *DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992), so may a federal agency, by a regulation within its authority to issue, grant persons subject to its authority more legally enforceable rights than a statute or the Constitution gives them. E.g., *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1954) ("regulations with the force and effect of law supplement the bare bones of" a statute (footnotes omitted)); *Leslie v. Attorney General of United States*, 611 F.3d 171, 178-80 (3d Cir. 2010); *Fisher v. United States* 402 F.3d 1167, 1177 (Fed. Cir. 2005); *Johnson Oyster Co. v. Baldridge*, 704 F.2d 1060, 1062-63 (9th Cir. 1983). "[R]ules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency. The doctrine was first announced in an immigration case in *United States ex rel. Accardi v. Shaughnessy*, where the Court vacated a deportation order of the Board of Immigration Appeals because the procedure leading to the order did not conform to the relevant regulations. The failure of the Board and of the Department of Justice to follow their own established procedures was held to be reversible error." *Montilla v. INS*, 926 F.2d 162, 166-67 (2d Cir. 1991) (citation omitted). As succinctly summarized by Professor Merrill, "even if the applicable statutes confer complete discretion on agency actors, if those actors have the authority to constrain their discretion by promulgating legislative rules, and they choose to do so, they have created law that can serve as the basis for judicial review." Thomas W. Merrill, "The *Accardi* Principle," 74 *Geo. Wash. L. Rev.* 569, 605 (2006).

In holding that the plaintiff is entitled to mandamus, we do not take a single step back from our previous decision. We held first that the Attorney General has unreviewable authority to revoke advance parole, and second that the plaintiff, not being in custody and not being in the United States or in Guantánamo Bay, *Boumediene v. Bush*, 128 S. Ct. 2229, 2258-62 (2008), cannot obtain habeas corpus relief. 335 F.3d at 548-52. Our opinion did not address the plaintiff's alternative claim to relief under the mandamus statute, though it had not been forfeited, having been preserved both in the district court and, on appeal, in this court.

Although we thus agree with the district judge that the plaintiff is entitled to relief, we don't agree with the form of relief that he ordered after our first decision. He ordered the government to allow the plaintiff to return to the United States, and to give him a removal hearing, or hold the hearing abroad if that's possible. But the government has never tried to remove the plaintiff, may never try, and for all we know would fare badly if it did try—and in any event a removal proceeding might be enjoined until the plaintiff's application for adjustment of status was resolved. *Afzal v. Holder*, 559 F.3d 677, 679 (7th Cir. 2010); *Subhan v. Ashcroft*, 383 F.3d 591, 595 (7th Cir. 2004); cf. *Benslimane v. Gonzales*, 430 F.3d 828, 831-33 (7th Cir. 2005); but see *Ahmed v. Gonzales*, 447 F.3d 433, 437-39 (5th Cir. 2006). And a removal proceeding might end favorably to the plaintiff despite the allegation that he is a "security risk," an allegation that for all we know may evaporate upon even the most superficial inquiry into its basis. In a removal proceeding he would be entitled to examine

and try to rebut any adverse evidence unless it was classified. 8 C.F.R. § 103.2(b)(16); *Ogbolumani v. Napolitano*, 557 F.3d 729, 735 (7th Cir. 2009). And if it was classified, he ordinarily would "be given notice of the general nature of the information and an opportunity to offer opposing evidence." 8 C.F.R. § 103.2(b)(16)(iv). But unless and until the government tries to remove the plaintiff, the courts cannot order a removal hearing.

We remand the case to the district court for the issuance of a mandamus commanding the Attorney General to take whatever steps are necessary to enable the plaintiff to reenter the United States for the limited purpose of reacquiring the status, with respect to his application for adjustment of status, that he enjoyed when he left the United States pursuant to the grant of advance parole later revoked. An order couched in terms of "take whatever steps are necessary" may seem vague. But the Attorney General has as we have indicated several means of compliance and we can let him decide which to employ to enable the plaintiff to return.

Lest the scope of our decision be exaggerated, we emphasize that the relief we are ordering will not "admit" the plaintiff to the United States in the sense of upgrading his status from that of a nonlawful resident of this country; it will merely enable him to pursue his application for an adjustment of status as long as he is permitted to remain in the country. And we intimate no view on whether he is entitled to such an adjustment. He very well may not be. But he has a right, conferred on him by the same agency of government that denies it, to

more consideration than he has received. The Attorney General can grant advance parole or deny it, as he wishes; he can revoke it at will; he can eliminate advance parole altogether, or change the rules governing it. But having made the rules, whatever they are, he must, until he changes them, play by them.

AFFIRMED IN PART, MODIFIED, AND REMANDED.

MANION, *Circuit Judge*, dissenting. Today the court remands this case "to the district court for the issuance of a mandamus commanding the Attorney General to take whatever steps are necessary to enable the plaintiff to reenter the United States . . . ." Opinion at 26. This directive mirrors the relief the district court granted Samirah more than seven years ago: "Defendants must issue, or arrange for the issuance of, any and all documents necessary to permit Sabri Samirah to enter the United States on or before March 28, 2003." In *Samirah v. O'Connell*, 335 F.3d 545 (7th Cir. 2003) ("*Samirah I*"), this court interpreted the district court's directive as an order reinstating Samirah's advance parole. And because the ordering of the reinstatement of advance parole is beyond this court's jurisdiction, *Samirah I* concluded that "[s]ection 1252(a)(2)(B)(ii) bars jurisdiction over the

rest of Samirah's action." *Samirah*, 335 F.3d at 552 (emphasis added). "The rest of Samirah's action" means exactly that—the rest of Samirah's action—which is why *Samirah I* "reversed" the district court's decision, but did not remand the case to the district court for further proceedings. *Id.* at 552. Because *Samirah I* resolved this case in its entirety, I respectfully dissent.

Samirah himself recognized that *Samirah I* barred all of his claims, stating as much in his petition for rehearing en banc filed with this court and his petition for certiorari to the Supreme Court. This court denied Samirah's petition for rehearing. And the Supreme Court denied Samirah certiorari. *See Samirah v. Ashcroft*, 541 U.S. 1085 (2004). Once this court and the Supreme Court denied Samirah's petitions for review, *Samirah I* became final.[1]

Nonetheless, the court today concludes that *Samirah I* is not dispositive because "the issues presented to us have changed," opinion at 1, and "the relief sought in the present appeal (mandamus) is different from that sought unsuccessfully in the prior one (habeas corpus)." Opinion at 2. But not only is the relief sought the same, *see supra* at 27 (and Samirah did seek relief through both habeas corpus and mandamus in *Samirah I*), "[t]he issues presented to us" also have not changed. In both *Samirah I* and

---

[1] The fact that *Samirah I* was on appeal from the grant of a preliminary injunction has no bearing on the finality of this court's holding that the district court lacked jurisdiction "over the rest of Samirah's action." *Samirah*, 335 F.3d at 552.

in this appeal, Samirah argued the same statutory and constitutional theories for relief, claiming jurisdiction then, as well as now, based on, among other grounds, the mandamus statute. The only issue that is new is the one the court has presented based on 8 C.F.R. § 212.5(e)(i). Samirah did not rely on § 212.5(e)(i) in *Samirah I*—he did not even cite that regulation in his appellate brief. And because he does not rely on that regulation in this current appeal,[2] the government has not had an opportunity to address the issues presented in the court's holding.

There is a good reason not to rely on § 212.5(e)(i)—that section does not apply to Samirah's situation. Section 212.5(e)(i) states that "parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5(e)(2)(i). But Samirah was never granted parole in the first place so obviously it could not be terminated. Samirah received advance parole and advance parole is not the same as parole.

The Board of Immigration Appeals ("BIA") explained this distinction in its *en banc* decision in *Matter of G-A-C-*, 22 I. & N. Dec. 83, 88 n.3 (BIA 1998) (*en banc*): "The term 'advance parole' is something of a misnomer, and this phrasing may cause some confusion. An alien in the United States can request an advance authorization of

---

[2] In fact, Samirah's only citation to § 212.5(e)(i) in his current appeal comes at page 10 of his appellee brief, where he summarizes the government's position that advance parole is not parole—a position with which he agreed at oral argument.

parole. If the request is approved, the alien is not at that point 'paroled.'" The BIA then stated that "[t]his is a distinction of some significance," *id.*, citing *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996). In *Barney*, the Ninth Circuit explained that "[a]lthough Petitioner received advance parole—a promise of parole upon her return—while she was an illegal overstay, she was not 'paroled' until she returned to the United States from Nigeria." *Id.* at 321. Thus, the court explained, "'at *the time of parole,*' as distinguished from the time of advance parole, the petitioner was an excludable alien like all aliens who seek admission to the United States at designated ports of entry." *Id.* The *Barney* court then concluded: "In other words, the advance parole gave Petitioner the right to return for the purpose of completing her Adjustment Application; it did not 'freeze' her status as an illegal overstay." *Id.* (In this case, though, Samirah's advance parole was revoked, so there was no right to return.) Similarly, the Second Circuit has distinguished advance parole from parole, stating: "'Advance parole' is the determination of an appropriate DHS officer that DHS should agree to the exercise of the parole authority under Section 212(d)(5)(A) of the Act before the alien's actual arrival at a port-of-entry. The actual decision to parole, however, is made at the port-of-entry." *See Ibragimov v. Gonzales*, 476 F.3d 125, 136 n.15 (2d Cir. 2007) (quoting Eligibility of Arriving Aliens in Removal Proceedings, 71 Fed.Reg. at 27,586 n.1 (May 12, 2006)). Moreover, as the *Ibragimov* court explained: "a decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-

entry, should DHS determine that parole is no longer warranted."[3] *Id.*

At oral argument, Samirah's attorney stated that the government had always maintained that "Samirah never had parole" and that "advance parole isn't actually parole." Significantly, Samirah's attorney then added: "And we agree with that." In fact, in his petition for rehearing to this court in *Samirah I*, Samirah stated that the Board's interpretation of advance parole, as not itself a "parole," receives *Chevron* deference. Petition for Rehearing at 4, n.3. Samirah then added: "In any event, the revocation of advance parole authorization is not the revocation of parole itself." *Id.*

Because advance parole is not parole, I do not believe § 212.5(e)(i) provides a basis for the relief Samirah seeks, namely re-entry into the United States.[4]

---

[3] While dicta in a footnote in *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005), does say that advance parole is a type of parole, that statement is inconsistent with the Board's view in *G-A-C-*, to which we owe deference, as well as the Ninth Circuit's decision in *Barney*, and the Second Circuit's decision in *Ibragimov.*

[4] Because § 212.5(e)(i) does not apply to advance parole and provides no right to the court's relief, it cannot form the basis for mandamus jurisdiction. *See Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002) ("Mandamus relief will be granted if the plaintiff can demonstrate that the three enumerated conditions are present: (1) a clear right to the relief sought; (2) that the defendant has a duty to do the act in question; and (3) no other

(continued...)

But assuming § 212.5(e)(i) applies to the revocation of Samirah's advance parole, I also disagree with the court's conclusion that Samirah's pre-advance-parole status was as "an applicant for adjustment of status," Opinion at 16, and its holding that to regain that status, Samirah must be allowed to return to the United States. Being an applicant for the adjustment of status is not an immigration status—if it were, there would be no need to assimilate such applicants to the status of an applicant for entry. *Palmer v. INS*, 4 F.3d 482, 484 (7th Cir. 1993). And if we are going to treat "status" as something other than a recognized immigration status, then Samirah's real status was that of an alien abroad with a grant of advance parole. And returning him to that status would simply require mandating that the government reinstate Samirah's advance parole.

Instead, though, the court's mandate to the district court requires "commanding the Attorney General to take whatever steps are necessary to enable the plaintiff to reenter the United States . . . ." Opinion at 26. This directive is not just indefinite, but beyond this court's power. The "several means of compliance" the court

---

[4] (...continued)

adequate remedy is available."). Thus, *Samirah I* is entirely consistent with *Iddir*, and there was no need to circulate *Samirah I* to the entire court pursuant to Rule 40(e). *Samirah I*, though, was circulated 40(e) because of the conflict it created with the Ninth Circuit concerning the availability of habeas corpus. *Samirah v. O'Connell*, 335 F.3d 545, 550 n.6. (7th Cir. 2003).

suggests as options are: (1) issue Samirah another I-512L form, Opinion at 6; (2) issue Samirah a visa, Opinion at 22; (3) parole Samirah, Opinion at 22; or (4) just admit Samirah into the United States without documentation, Opinion at 6, 23. (1) is reinstatement of advance parole, which is beyond our power to order. *See Samirah I*, 335 F.3d at 552. (2) is barred by the consular non-reviewability doctrine and the fact that the State Department is not a party. (3) is a purely discretionary decision for the Attorney General, which this court lacks jurisdiction to order, and in any event would not provide a means for Samirah to reach a port-of-entry—as he is still in Jordan and lacks a travel document to get to a port-of-entry.[5] And (4) violates the INA. 8 U.S.C. § 1182(7)(A)(i).[6] What the court cannot order directly, it cannot order indirectly through a "whatever steps are necessary" mandate. But if the court insists on forcing

---

[5] Directing the government to grant Samirah parole would also provide Samirah with greater rights than he held as an advance parolee, because someone granted advance parole can still be denied parole at the border. *See Ibragimov v. Gonzales*, 476 F.3d 125, 136 n.15 (2d Cir. 2007) (quoting Eligibility of Arriving Aliens in Removal Proceedings, 71 Fed.Reg. at 27,586 n.1 (May 12, 2006)).

[6] It would also seem that the "whatever steps are necessary" mandate would require the government to remove Samirah from a no-fly list, if he is indeed on such a list, as the court assumes. Opinion at 7. The propriety of including Samirah on a no-fly list, though, has never been litigated and should not be unconditionally ordered by the court today.

the government to allow Samirah back into the United States, it should just straightforwardly mandate reinstatement of his advance parole. Although I do not agree that we have jurisdiction to do so, that would be the most efficient use of mandamus.